# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

UNITED STATES OF AMERICA,  )
                           )
           Plaintiff,      ) Case No.: 2:14-cr-0262-JCM-GWF
                           )
vs.                        ) **FINDINGS &**
                           ) **RECOMMENDATIONS**
PATRICK LYNN WASHINGTON,   )
                           ) **Motion to Suppress (#19)**
           Defendant.      )
_____)

This matter is before the Court on Defendant Patrick Lynn Washington's Motion to Suppress (#19), filed on September 9, 2014. The Government filed its Response (#60) on December 4, 2014 and Defendant filed his Reply (#63) on December 8, 2014. The Court conducted an evidentiary hearing in this matter on January 21, 2015.

The indictment in this case charges Defendant Patrick Lynn Washington with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). These charges arise from an entry made by police officers into the apartment occupied by Defendant in response to the report of a domestic violence incident. Defendant argues that the ammunition and firearms discovered during the initial warrantless entry of the apartment were obtained in violation of the Fourth Amendment and should be suppressed.

## FACTUAL BACKGROUND

This case arises out of an emergency 911 call on July 5, 2014 at approximately 12:36 A.M. The caller sounded frightened and stated that she was in fear of her husband whom she identified as Patrick Washington. The caller provided her address and requested that police come to assist her. The caller told the operator that her husband had two handguns and that he was presently in the

other room of the apartment. The 911 call was interrupted, but the line remained open and a woman's voice can also be heard stating "two guns." *Government's Exhibit 5, Recording of 911 Call.*

      **Officer Justin Spurling.** Las Vegas Metropolitan Police Department (LVMPD) officer Justin Spurling testified that shortly after midnight on July 5, 2014 he was dispatched to 1327 H Street, building number two, apartment number 432, for a domestic violence call–a female being held against her will. Officer Spurling testified that the officers were notified by dispatch that there were "two firearms in play." Several police officers responded to the apartment unit, including Officer Travis Humpherys. Officer Spurling testified that Mr. Washington was in the front bedroom of the apartment and spoke to the officers through the window. Officer Spurling testified that, through the window, he observed an adult female lying on the bed crying and holding a child. Another child was on the floor. Mr. Washington closed the window blinds so that the officers could not see inside. The officers then made a "dynamic," i.e. forcible, entry into the apartment. Upon entering the apartment, the officers encountered Defendant Washington in the bedroom located immediately to the right of the front doorway. The officers took Defendant into custody and patted him down for weapons. The officers also secured Defendant Washington's wife. Although Officer Spurling did not observe the pat down of Defendant Washington, he was informed that bullets were found on Defendant's person.

      Officer Spurling testified that he conducted a protective sweep of the apartment during which "we sweep for anybody else." He testified that a protective sweep is conducted to make sure that no one else is present who may be a victim or pose a danger to the officers. He also indicated that officers generally sweep the entire residence to ensure that no one else is present who might pose a threat to the officers. Officer Spurling further stated: "As well as a sweep for weapons that were in play– that wasn't the intent–anything outlying that might be used to harm us– is something we're going to check for and put away." The protective sweep in this case included the outside patio or balcony of the apartment which Officer Spurling indicated was located off the living room area of the apartment. Officer Spurling testified the door to the balcony was not locked. Upon entering the balcony, he observed a stack of four automobile tires. He could see that the top tire

was on a rim, but did not know if the tires below were also on rims. *See Government's Exhibit 1, photograph of stacked tires.* Officer Spurling testified that as he walked past the tires, he shined his flashlight into the well of the tires to see if someone was hiding inside. He indicated that he made a "quick glance" into the tires and observed two handguns as shown in the photographs admitted as *Government's Exhibits 2* and *3*. After observing the firearms and making sure no one else was in the apartment, the police officers froze the scene until firearms investigation detectives could respond.

Officer Spurling testified that after he discovered the firearms, another police officer told him that a background check had been run on Defendant Washington which indicated that he was a convicted felon. He testified that even if he had not seen the handguns, he would have still believed there were firearms in the apartment based on the dispatch report of the 911 call and the discovery of bullets in Mr. Washington's pocket. Officer Spurling further testified that he would have notified the firearms detectives that a call had been received from a female stating that she was being held against her will with firearms, that ammunition had been found in the apartment, and that Defendant was a registered felon. It would then have been for the detectives to decide whether to respond to the scene or to request a search warrant.

**Officer Travis Humpherys**. Officer Travis Humpherys testified that he also went to the apartment on July 5, 2014 in response to the domestic violence call. He stated that he was informed through dispatch and the officers' CAD (computer) system that a female had called 911 stating that she was in fear of her life, was confined to one of the back bedrooms, and that the individual inside the apartment had two firearms in his possession. Upon arriving at the scene, Officer Humpherys positioned himself on the north side of the third floor courtyard away from the Defendant's apartment door which was on the south side. Other officers were gathered or "stacked" near the apartment door. Officer Humpherys was able to hear what the officers were saying to the individual inside the apartment, but he could not hear what the individual inside was saying. The officers advised the person inside that they needed to investigate and that they were not going away. Officer Humpherys testified that before the officers entered the apartment, he ran a background check on Mr. Washington through the police department's records bureau and was

advised that Defendant had previous felony convictions. He did not recall whether he relayed this information by radio to the other officers before they entered the apartment. The officers then made a forced entry into the apartment. Officer Humpherys followed the other officers into the apartment.

After entering the apartment, Officer Humpherys made contact with Mr. Washington who had already been placed in handcuffs by other officers. Officer Humpherys escorted the Defendant outside the front door of the apartment and performed a *Terry* pat down on his person. He did not recall whether Defendant was wearing a shirt, but testified that he was wearing pants. While touching the exterior of Defendant's front pants pocket area, Officer Humpherys felt an object that appeared to be ammunition. He asked the Defendant what it was and the Defendant stated that "there were some bullets in there." Officer Humpherys then slightly pulled out the pocket and observed the bullets. He testified that at the time he performed the pat down, he believed that Mr. Washington had committed felony coercion or attempted kidnaping based on the dispatch report regarding the female's 911 call. Under later questioning by Government counsel, Officer Humpherys also testified that based on the information that Mr. Washington was a convicted felon, he recognized that it was unlawful for him to possess ammunition.

Officer Humpherys testified that after other officers conducted the protective sweep of the apartment, he heard Officer Spurling or another officer yell that they had found firearms on the balcony. Officer Humpherys went to the balcony and viewed the firearms in the wheel well of the tires. Officer Humpherys called the police sergeant and told him that the officers had frozen the premises and needed the detectives to come out. Officer Humpherys also testified that even if the firearms had not been found, he would have contacted his sergeant and requested that firearms detectives be notified or asked to come to the scene based on the information in the 911 call, the fact that Mr. Washington was a convicted felon and that ammunition had been found on his person.

**Detective Rinetti**. LVMPD Detective Lawrence Rinetti testified that in July 2014, he was a member of the firearms investigation unit which is part of the LVMPD's gang crimes bureau. Detective Rinetti stated that he and other detectives were summoned to Defendant's apartment by patrol officers in regard to the domestic violence incident. Detective Rinetti testified that he was

informed about the substance of the 911 call and the dispatch report. He was also informed that the officers had found bullets on Defendant's person, and had found two firearms during a protective sweep of the apartment. After checking with his supervisor, Detective Rinetti went to the scene and subsequently prepared an application for a telephonic search warrant to search the apartment for firearms, ammunition and related items. *See Government's Exhibit 4, Search Warrant Application, Warrant and Return.* Detective Rinetti testified that if he had been provided with the same information about the 911 call and the information obtained at the scene, except for the discovery of the two handguns, he would still have responded to the scene to investigate. He testified that officers told him that Defendant had bullets inside his pocket, that Defendant was a prohibited person and a multi-time convicted felon. Based on this information, he also would have requested a search warrant to search the premises for firearms. Detective Rinetti testified that once a search warrant was issued, the entire apartment, including the tires on the balcony, would have been thoroughly searched and the firearms discovered.

On cross-examination, Detective Rinetti testified that he was informed by the criminal records division that Mr. Washington had two felony convictions, one for a violent crime and the other for narcotics. The information provided to Detective Rinetti regarding Defendant Washington's prior criminal record was incorrect. Defendant, however, did have a 2005 federal felony conviction for "Person Convicted of Domestic Violence in Possession of a Firearm. *See Indictment (#1).*

**Detective Hodson**. Detective Breck Hodson testified that he went to Defendant's apartment on July 5, 2014 in response to the police officers' request. Detective Hodson also testified that he would have responded to the scene based on the other information provided by the officers, even if he had not been informed that firearms had been found during a protective sweep of the apartment. Detective Hodson testified that he is aware that federal law prohibits a convicted felon from possessing ammunition. Detective Hodson also testified that once a search warrant was obtained, the officers would have searched the apartment for firearms, including searching the tires on the balcony.

. . .

The telephonic search warrant application submitted by Detective Rinetti recited the following facts in support of his assertion that probable cause existed to search the apartment: (1) the information regarding the 911 telephone call stating that a male was preventing the female victim from leaving the residence during the domestic disturbance and that he was threatening her with firearms; (2) that upon the officer's arrival, the suspect refused to answer the front door and told the officers to leave and that they would need a warrant; (3) that the officers entered the apartment and took the defendant into custody; (4) that while conducting a protective sweep of the residence, Officer Spurling observed two firearms in plain view on the back patio between two tires; (5) that the suspect, Patrick Washington, was a two time convicted felon; and (6) a plastic bag containing two bullets was found in his front pocket when he was taken into custody. *See Government Exhibit 4, Application for Telephonic Search Warrant, pgs. 3-4.* (The Government blocked out that part of the application that refers to the discovery of the firearms to demonstrate what information supporting probable cause would have still been in the application.)

## DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." Warrantless entries into the home are presumptively unreasonable. *United States v. Perea-Rey*, 680 F.3d 1179, 1186 (9th Cir. 2012), quoting *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

**1.    Initial Warrantless Entry.**

Defendant Washington has not challenged the lawfulness of the officers' initial entry into the apartment. The entry was, in any event, clearly lawful. The "exigent circumstances exception" to the warrant requirement provides that no warrant is required when the officers have probable cause to search and "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *United States v. Struckman*, 603 F.3d 731, 743 (9th Cir. 2010), quoting *Brigham City, Utah v.*

*Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, (2006) and *Mincey v. Arizona*, 437 U.S. 385, 393-94, 98 S.Ct. 2408 (1978).  "Exigent circumstances are defined to include those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Fisher v. City of San Jose*, 558 F.3d 1069, 1075 (9th Cir. 2009) (internal quotation marks omitted). *See also United States v. Snipe*, 515 F.3d at 950 ("The need to protect or preserve life or avoid serious injury is one such justification for what would be otherwise illegal absent exigency or emergency.").  Here, the officers were informed that the Defendant's wife had called 911 stating that she was being held against her will by the Defendant, that she was in fear of her life or physical safety, and that Defendant had two firearms.  Defendant refused to allow the officers to enter the apartment to determine the well being of his wife, who they initially observed through the window lying on the bed, crying.  The officers were justified in entering the apartment to protect the Defendant's wife from the threat he posed to her.

### 2. Whether the Firearms Were Discovered During a Reasonable "Protective Sweep" of the Premises.

"A 'protective sweep' is a quick and limited search of premises incident to arrest and conducted to protect the safety of police officers and others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 1094 (1990).  In *Buie*, the police obtained an arrest warrant for the defendant and his suspected accomplice for the robbery of a pizza restaurant.  After determining that the defendant was home, the officers entered his residence to execute the arrest warrant.  The officers fanned out through the residence in search of the defendant.  One of the officers shouted down into the basement, ordering anyone down there to come out.  When a voice asked who was calling, the officer stated three times "this is the police, show me your hands."  Eventually, the defendant emerged from the basement with his hands raised.  He was arrested, searched and handcuffed by the officer.  Another officer thereafter entered the basement "'in case there was someone else down there.'"  In the basement, the officer observed, in plain view, a red running suit

which matched the clothing worn by one of the robbers. The Maryland Court of Appeals held that the search of the basement violated the Fourth Amendment because the officers lacked probable cause to believe that a serious and demonstrable danger existed from someone hiding in the basement. In reversing that decision, the Supreme Court stated:

> We also hold that as an incident to the arrest, the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

494 U.S. at 334, 110 S.Ct. at 1098.

The Court further emphasized that "a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises. *Id.*, 494 U.S. at 335-36, 110 S.Ct. at 1099. The Court in *Buie* did not decide whether the protective sweep at issue was lawful, but instead remanded the case to the state court for further determination. In a concurring opinion, Justice Stevens asserted that the state could face a "formidable task" on remand to demonstrate that the protective sweep complied with the standard adopted by the Court. *Buie*, 494 U.S. at 337-339, 110 S.Ct. at 1100-01. Justice Kennedy stated in his concurrence, however, that based on his present understanding of the record, the officers' conduct was reasonable and lawful. *Id.*, 494 U.S. at 339, 110 S.Ct. at 1101.

In *United States v. Lemus*, 582 F.3d 958 (9th Cir. 2009), the police officers went to the defendant's house to arrest him on a warrant. The officers encountered the defendant outside his residence and told him that they were there to arrest him. The defendant moved away from the officers toward a sliding glass door to the living room of his apartment. The officers arrested the defendant as he started to walk through the sliding glass door. Other officers then entered the apartment and conducted a "protective sweep" of all the rooms. One of the offices observed the butt

of a handgun sticking out of the couch in the living room. After confirming that it was a firearm, the officers obtained a search warrant based on the fact that as a convicted felon, defendant was prohibited from having a firearm. In upholding the seizure of the firearm, *Lemus* characterized the search as a "protective search incident to arrest." The court stated that under *Buie* such a protective search can be conducted without probable cause or reasonable suspicion if two conditions are present: "First, the area searched must 'immediately adjoin[]' the area of arrest. Second, the area searched must be one 'from which an attack could be immediately launched,' and thus in any event must be capable of concealing at least one person." *Lemus*, 582 F.3d at 963.

The court found that both conditions were met because the defendant was arrested at the sliding glass door to the living room, and the firearm was observed in plain view in the couch located in the living room. In support of its holding that the living room immediately adjoined the area where the defendant was arrested, the court cited the following cases: *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 628 (7th Cir. 2008); *United States v. Charles,* 469 F.3d 402, 405–06 (5th Cir. 2006); *United States v. Thomas,* 368 U.S.App. D.C. 285, 290–91, 429 F.3d 282, 288 (D.C.Cir. 2005); *In re Sealed Case,* 153 F.3d 759, 763, 770 (D.C.Cir. 1998) and *United States v. Lauter,* 57 F.3d 212, 216–17 (2d Cir. 1995). *Lemus*, 582 F.3d at 963-64. The court further noted that the living room not only immediately adjoined the area of arrest, it was a place from which an attack could have been immediately launched on the officers. *Id.*, at 964. Because the protective search was reasonable under the first prong of *Buie*, the court did not reach the second prong as to whether the officers had reasonable suspicion to search the apartment for potentially dangerous persons. *Id.* 582 F.3d at 964.

In *In re Sealed Case 96-3167*, 153 F.3d 759, 769 (D.C.Cir. 1998), cited in *Lemus*, officers entered a house based on probable cause to believe that a burglary was in progress. The court held that a small bedroom next to the bedroom in which the defendant was arrested was within the area immediately adjoining the place of arrest and could be searched without probable cause or reasonable suspicion. The court also found that the search of the small bedroom could be justified to protect residents of the house from a possible accomplice-burglar or to locate residents who might be hiding in fear of the burglar. *Id.*, at 770. In *United States v. Thomas*, 429 F.3d 282 (D.C.Cir. 2005),

9

also cited in *Lemus*, the court held that a bedroom located at the far end of a 15 foot hallway from where the defendant was arrested was in the area immediately adjoining the place of arrest. Upon entering that bedroom, the officers looked inside a closet and observed a mound under a blanket which could have been a human being. Instead of a person, the officers found an assault rifle and a shotgun under the blanket. The *Thomas* court indicated that the entirety of a small apartment could be in the area immediately adjoining the place of arrest and therefore subject to a protective search without the requirement of probable cause or reasonable suspicion. *Id.*, 429 F.3d at 287-88. In *United States v. Lauter*, 57 F.3d 212 (2d Cir. 1995), the defendant was arrested in the front room of a small two room apartment. An officer entered the second room and removed a female from that room. A second officer then entered the room and looked on the other side of the bed where he observed a shotgun. The court held that the second room immediately adjoined the area of arrest and that it was reasonable for the officer to again enter that room to determine if there was some residual danger.

Courts in other cases have also relied on the small size of the residence and the proximity of the other rooms to the area of arrest to hold that they are subject to a protective sweep or search under the first prong of *Buie*. In *United States v. Sunkett*, 95 F.Supp.2d 1367 (N.D.Ga. 2000), the defendant was taken into custody just outside the front door of the apartment. After the defendant was handcuffed, the officers conducted a protective sweep of the apartment which included a closet in the bedroom in which a firearm was found. In upholding the protective sweep of the bedroom and closet, the court stated:

> In this case, the front door of the apartment opened into a living room–dining room. Adjacent to this area was a kitchen which opened into the living room-dining room. A small hallway also opened into the living room-dining room area. The bathroom and bedroom opened into this hallway. The front door of the apartment was visible from the door of the bedroom. . . . Anyone in the bedroom posed an immediate risk to the officers in the doorway of the apartment. Therefore, a search of the bedroom was an appropriate type one *Buie* search.

95 F.Supp.2d at 1368.

In *United States v. Davis*, 906 F.Supp.2d 545 (S.D.W.Va. 2012), the court also upheld a protective sweep of all the rooms in a small house based on the following analysis:

> Central to the Court's analysis is the fact Defendant's house is very small, consisting of a single-story four-square floor plan with a small bathroom and interior hallway. Defendant was arrested near the center point of the house, that is the interior hallway adjoining the living room, bathroom, and the two bedrooms. An attack by an unseen third party could have been immediately launched from any of the four adjoining rooms. Indeed, a person could traverse the entire width or length of Defendant's house in seconds with just a few quick strides. Moreover, the officers' sweep and Defendant's arrest were nearly simultaneous. The officers' check of the rooms was prudent, cursory and over and done with in about two minutes.

906 F.Supp.2d at 552.

The Sixth Circuit in *United States v. Archibald*, 589 F.3d 289 (6th Cir. 2009), however, applied a narrower interpretation of the area immediately adjoining the place of arrest. The defendant in that case was arrested at or just inside the front door of his apartment. The front door opened into a living room area which was separated from a kitchen area by a solid bar counter which obscured the view into the kitchen. The officers conducted a protective sweep into the kitchen where they observed illegal narcotics in plain view. The court stated that the kitchen was not in the area immediately adjoining the place of arrest. Citing Justice Stevens' concurring opinion in *Buie*, the court stated that "by extending the scope of the protective sweep, the officers ran the risk of exposing themselves to more danger. . . . [T]here was no indication from viewing the area immediately adjoining the place of arrest (i.e., the living room) that an attack could be immediately launched." *Id.*, 589 F.3d at 298.

The Government did not clearly develop the layout of Defendant's apartment during the evidentiary hearing in this case. Officer Spurling's testimony, although somewhat vague, indicates that the front door of the apartment opened into the living room area, and that the sliding glass door to the balcony was located off the living room. Officer Spurling indicated that he and other officers spread out through the apartment to conduct the protective sweep nearly simultaneously with Defendant being taken into custody in the front bedroom. Under cases such as *Thomas*, *In re Sealed Case 96-3167*, *Lauter*, *Sunkett* and *Davis*, the balcony would probably be considered within the area immediately adjacent to the place of arrest. Under *Archibald*, it would not. On balance, the Court finds that the balcony was within the area immediately adjacent to the place of arrest, because it reasonably appears to be a location from which an immediate attack could have been launched on

11

the officers.

The second question is whether it was reasonable for Officer Spurling to look inside the stacked tires as part of the protective sweep of the balcony. *Buie* states that a protective sweep "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Lemus* further states that "the area searched must be one 'from which an attack could be immediately launched.'" Consistent with this rule, officers may look inside closets, under beds, behind furniture or underneath blankets or other places where it reasonably appears a potential assailant could be hiding. In this case, it is questionable whether a person, other than perhaps a small child, could fit within the space created by the three stacked tires–with a fourth tire, mounted on a wheel, on top of the stack. Assuming that a person was able to fit into such a space, it is also doubtful that he or she would be able launch an attack on officers from such a location. Officer Spurling's testimony that he looked inside the stacked tires for a potential attacker is therefore objectively unreasonable. It also appears from the photographs that Officer Spurling could not have seen the firearms by simply glancing down at the tires as he passed by. He would, instead, have had to look down into the wheel well with his flashlight to see the firearms. *See Government's Exhibits 1, 2* and *3*. Officer Spurling's search inside the wheel well of the stacked tires cannot be justified under the first prong of *Buie*.

For the same reason, Officer Spurling's search into the well of the stacked tires cannot be justified under the second prong of *Buie*. In any event, the officers did not have reasonable suspicion to believe that other individuals were present in the apartment who posed a risk of danger to the officers. Defendant's wife reported to the 911 operator that she was being threatened by her husband. Before entering the apartment, the officers spoke with Defendant and observed his wife and the children in the front bedroom. Once the Defendant, his wife and children were secured, the officers had no reason to suspect that other individuals were in the apartment who might pose a threat to the officers or others. Officer Spurling's discovery of the firearms in the wheel well of the tires cannot be justified under the "protective sweep" exception to the Fourth Amendment.

. . .

. . .

### 3. Whether Evidence of the Firearms is Admissible Under the Inevitable Discovery Doctrine.

The Government argues that even if Officer Spurling discovered the firearms as the result of an unlawful search, the firearms should still be admissible under the inevitable discovery doctrine. The inevitable discovery doctrine was recognized in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501 (1984). In *Nix*, police officers obtained a statement from the defendant, in violation of his right to counsel, as to the location of the murder victim's body. At the time this statement was obtained, other law enforcement officers were conducting an extensive search for the body which would have been discovered within a few hours even if the defendant had not told the police where to find it. The trial court therefore admitted evidence regarding the location and condition of the body on the grounds that it would have inevitably been discovered through lawful means. In affirming, the Supreme Court noted that the closely related "independent source doctrine" allows admission of evidence that has been discovered by means wholly independent of any constitutional violation. The Court stated that the independent source doctrine teaches that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred." 467 U.S. at 443, 104 S.Ct. at 2509. The Court stated "that exclusion of evidence that would inevitably have been discovered would also put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place." *Id.* The Court therefore held that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *Id.*, 467 U.S. at 444, 104 S.Ct. at 2509.

The Ninth Circuit states that "if, 'by following routine procedures, the police would inevitably have uncovered the evidence,' then the evidence will not be suppressed despite the constitutional violation." *United States v. Young*, 573 F.3d 711, 721 (9th Cir. 2009), citing *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989). *Young* and other Ninth Circuit decisions make clear, however, that the inevitable discovery exception cannot be applied so as to

excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant. *Id.*, 573 F.3d at 723, quoting *United States v. Mejia*, 69 F.3d 309, 320 (9th Cir. 1995).

In *United States v. Echegoyen*, 799 F.2d 1271, 1280 n. 7 (9th Cir. 1986), the court stated, in dicta, that *Nix* upheld the admissibility of the evidence because an independent ground search simultaneously conducted by the police would have inevitably discovered the evidence. The court stated that because there were not two independent investigations or searches in progress in the case before it, but rather only one continuous investigation, the inevitable discovery doctrine did not apply. In *United States v. Boatwright*, 822 F.2d 862, 864 (9th Cir. 1987), however, the court stated that *Echegoyen*'s requirement that "two independent searches be in progress" was inconsistent with the teachings of cases before and after *Echegoyen*. The court further stated:

> There will be instances where, based on the historical facts, inevitability is demonstrated in such a compelling way that operation of the exclusionary rule is a mechanical and entirely unrealistic bar, preventing the trier of fact from learning what would have come to light in any case. In such cases, the inevitable discovery doctrine will permit introduction of the evidence whether or not two independent investigations were in progress. The existence of two independent investigations at the time of discovery is not, therefore, a necessary predicate to the inevitable discovery exception.

The court further stated:

> We do discern, however, an element that should be shown in most, if not every, case to which the doctrine pertains. Absent some overriding considerations not now apparent to us, the doctrine requires that the fact or likelihood that makes discovery inevitable arise from circumstances other than those disclosed by the illegal search itself.

*Id.*, 822 F.2d at 864-65.

The court in *Boatwright* held that the inevitable discovery doctrine did not apply in that case because the discovery of illegally possessed firearms resulted from the officers' unlawful entry into defendant's apartment. The officers would have had no reason to believe that firearms were present in the apartment but for that unlawful entry.

In *United States v. Mejia*, 69 F.3d 309 (9th Cir. 1995) and *United States v. Reilly*, 224 F.3d 986 (9th Cir. 2000), officers conducted warrantless searches of the defendants' residence or motel room pursuant to invalid or allegedly invalid consents to search obtained from the defendants. In

14

both cases, the court declined to apply the inevitable discovery doctrine based on the government's argument that absent consent, probable cause also existed to support the issuance of search warrants. The court refused to apply the inevitable discovery doctrine where the officers could have obtained search warrants, but chose, instead, to rely on invalid or allegedly invalid consents to search. *Mejia*, 69 F.3d at 319-320; *Reilly*, 224 F.3d at 995.

In *United States v. Young,* the police officer allegedly had probable cause to search defendant's hotel room based on information that he had stolen property belonging to another guest and based on the hotel employees' discovery of a firearm in defendant's room. The officer also had information that defendant was a convicted felon and was therefore prohibited from possessing a firearm. Rather than first seek a search warrant, the officer entered the room with the hotel's security personnel and seized the firearm. On these facts, the court refused to apply the inevitable discovery doctrine. The dissenting judge in *Young* argued, however, that because the officer possessed all of the facts necessary to establish probable cause to search for an illegally possessed firearm before entering defendant's hotel room, the inevitable discovery doctrine should have been applied. 573 F.3d at 723-28.

Most recently in *United States v. Camou*, 773 F.3d 932 (9th Cir. 2014), the court again declined to apply the inevitable discovery doctrine in circumstances where a law enforcement officer conducted a warrantless search notwithstanding that probable cause existed to support the issuance of a search warrant had one been sought. In *Camou*, border patrol agents arrested the defendant for alien smuggling and seized his cell phone during the arrest. The agents had probable cause to search the cell phone for evidence relating to alien smuggling. Approximately, an hour and a half after the arrest, an agent conducted a warrantless search of defendant's cell phone, presumably for evidence of alien smuggling, and found evidence of child pornography. Several days later, the FBI obtained and executed a warrant to search the cell phone for child pornography. In holding that the inevitable discovery doctrine did not apply, the court first stated that the government failed to show by a preponderance of the evidence that it would, in fact, have applied for and obtained a warrant to search the phone for evidence of alien smuggling. The evidence showed, to the contrary, that the government decided not to pursue alien smuggling charges against the defendant on the same day as

1  his arrest. The court further stated:

2  > Second, and more importantly, *Mejia* governs this case. By asking this
3  > court to conclude that the inevitable discovery exception applies here
4  > because a search warrant would have issued, the government is asking
5  > us to "excuse the failure to obtain a search warrant where the police
6  > had probable cause but simply did not attempt to obtain a warrant."
7  > *Mejia,* 69 F.3d at 320. Under *Mejia,* this is impermissible and the
8  > inevitable discovery exception to the exclusionary rule is not satisfied.

6  773 F.3d at 943.

7  In this case, the police officers were informed prior to making entry into Defendant's apartment that his wife had called 911 and stated that she was in fear of her husband who had two firearms in his possession. Officer Humpherys also testified that prior to the entry, he was informed through a records department background check that Defendant Washington had prior felony convictions. Upon performing a pat down of Defendant's person for weapons, Officer Humpherys discovered ammunition in his front pants pocket.

During the evidentiary hearing, Defendant also challenged the legality of the discovery of the ammunition. Officer Humpherys testified, however, that based on his experience, he recognized the presence of bullets when he felt the exterior of Mr. Washington's pants pocket, which he knew Defendant was prohibited from possessing as a result of his status as a convicted felon. Officer Humpherys also testified that he had reason to believe that Defendant had committed the crimes of felony coercion or attempted kidnaping based on the dispatch report regarding the 911 call from Defendant's wife. Under these circumstances, the officers had probable cause to arrest Defendant Washington, and Officer Humpherys's search of his person can also be upheld as a search incident to arrest. *See United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) and *United States v. Ruckes*, 586 F.3d 713, 717 (9th Cir. 2009), citing *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467 (1973).

Defendant also argued during the evidentiary hearing that the two felony convictions listed in the search warrant application, battery with a deadly weapon and possession of a controlled substance, were, in fact, misdemeanor and not felony convictions. Detective Rinetti testified that in applying for the warrant, he relied on information provided by the criminal records division that Defendant had felony convictions for the listed crimes. Because the issue was not raised in

1  Defendants' motion, the Government was not placed on notice of the need to present any additional
2  evidence relating to the information provided to Detective Rinetti or Officer Humpherys about
3  Defendant Washington's criminal history.
4        The Fourth Amendment is not violated where an officer's determination of reasonable
5  suspicion or probable cause was based on a reasonable mistake of fact. *Illinois v. Rodriguez*, 497
6  U.S. 177, 183-186, 110 S.Ct. 2793 (1990) and *United States v. Song Ja Cha*, 597 F.3d 995, 1005
7  (9th Cir. 2010). In *Heien v. North Carolina*, --- U.S. ----, 135 S.Ct. 530 (2014), the Supreme Court
8  has also recently held that an officer's reasonable mistake of law can still support reasonable
9  suspicion or probable cause. As a general matter, it is reasonable for police officers in the field to
10 rely on information provided by the police department's criminal records department concerning a
11 suspect's criminal history. *See Herring v. United States*, 555 U.S. 135, 129 S.Ct. 695 (2009) (officer
12 reasonably relied on incorrect information provided by a neighboring county sheriff's office that
13 there was an active warrant for the defendant's arrest). Such reliance may be not be reasonable,
14 however, when the officer has the time and ability to determine the accuracy of pertinent facts prior
15 to seeking a warrant. Defendant Washington was, in fact, a convicted felon. Thus, if the detectives
16 had been able to further investigate Defendant's criminal record before seeking the search warrant,
17 they would have discovered that he was a convicted felon.
18       Application of the inevitable discovery doctrine or exception is justified under the facts and
19 circumstances of this case. Assuming that Officer Spurling had not discovered the two firearms, the
20 police officers would still have been in possession of the following information after their lawful
21 entry into Defendant's apartment: (1) Defendant Washington was a convicted felon who was
22 prohibited from possessing firearms, (2) Defendant's wife contacted the police and reported that
23 Defendant was threatening her, and that he was in possession of two firearms, and (3) ammunition
24 was found in Defendant's pants pocket. Based on these facts, the police officers had probable cause
25 to believe that firearms, which defendant was prohibited from possessing, were located somewhere
26 in the apartment.
27       Officer Spurling and Officer Humpherys both testified that even absent the discovery of the
28 firearms, they would have still contacted their superiors and requested that detectives respond to the

scene to investigate and possibly seek a search warrant for firearms. Detectives Rinetti and Hodson testified that absent the information that firearms had been discovered in the apartment, they would have still gone to the apartment and would have applied for a warrant to search the apartment for firearms. The officers' and detectives' testimony is, of course, self-serving. The Court finds, however, that their testimony is also credible under the circumstances. It is highly unlikely that the officers would have simply gone away or arrested Defendant Washington on domestic violence charges without seeking a warrant to search the apartment for firearms when they had reason to believe that two handguns were located somewhere in the apartment. The Court therefore finds by a preponderance of the evidence that the police officers would have applied for and obtained a warrant to search the apartment for firearms.

This case is also distinguishable from *Mejia*, *Reilly*, *Boatwright*, *Young* and *Camou* in which the court declined to apply the inevitable discovery doctrine where to do so would be to excuse the officers' failure to apply for a search warrant. In this case, the police did, in fact, timely apply for and obtain a search warrant following their entry into Defendant's apartment. That search warrant application included the facts regarding Officer Spurling's discovery of the firearms–which the officers arguably believed was lawful under the protective sweep and the plain view exceptions to the Fourth Amendment– but which this Court concludes cannot be validated by those exceptions. Because the Court concludes that the police officers would *still* have applied for and obtained a search warrant even without the information relating to the discovery of the firearms, the warrant requirement of the Fourth Amendment will not be undermined in this case by application of the inevitable discovery doctrine, as it would be if the officers had made no effort to obtain a search warrant.

## **CONCLUSION**

The Court concludes that Officer Spurling's warrantless discovery of the firearms inside the stacked tires in Defendant's apartment cannot be justified under the protective sweep exception to the Fourth Amendment. The Court concludes, however, that the firearms would have inevitably been discovered pursuant to the execution of a search warrant based on the other facts set forth in the search warrant application. Accordingly,

**RECOMMENDATION**

**IT IS RECOMMENDED** that Defendant's Motion to Suppress (#19) be **denied**.

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 3rd day of February, 2015.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge